UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

FLORIDA MARINE TRANSPORTERS, INC. * Docket 04-CV-1354-F
* New Orleans, Louisiana
versus *
* June 15, 2006, 9:00 a.m.
MICHAEL L. SANFORD *
* * * * * * * * * * * * * * * *

VOLUME IV
JURY TRIAL BEFORE THE
HONORABLE MARTIN L.C. FELDMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Florida Marine Transporters, Inc.: Staines & Eppling
BY: ANTHONY J. STAINES, ESQ.
STEPHEN E. MATTESKY, ESQ.
3500 N. Causeway Blvd., Suite 820
Metairie, Louisiana 70002

For Michael E. Sanford: O'Bryan Baun Cohen Kuebler
BY: DENNIS M. O'BRYAN, ESQ.
GARY W. BAUN, ESQ.
401 S. Old Woodward, Suite 320
Birmingham, Michigan 48009

Official Court Reporter: Toni Doyle Tusa, CCR, FCRR
500 Poydras Street, B-406
New Orleans, Louisiana 70130
(504) 589-7778

Proceedings recorded by mechanical stenography, transcript produced by computer.

# I N D E X


| | Page |
|---|---|
| Closing Argument | |
| Dennis M. O'Bryan, Esq. | 479 |
| Stephen E. Mattesky, Esq. | 496 |
| Dennis M. O'Bryan, Esq. | 512 |
| Jury Instructions | 519 |
| Jury Verdict | 547 |

**PROCEEDINGS**

**(June 15, 2006)**

**THE DEPUTY CLERK:** All rise.

Court is in session. Please be seated.

**THE COURT:** Good morning. I hope you had a nice evening. We will now begin the closing arguments of counsel, and then you will receive the Court's instructions on the law that's applicable to this case. Mr. O'Bryan will go first, followed by counsel for the defendants, and then Mr. O'Bryan will have an opportunity for brief rebuttal since the plaintiff at all times has the burden of proof regarding the claim that the plaintiff is making.

Mr. O'Bryan.

**MR. O'BRYAN:** Thank you, Your Honor. Thank you, Members of the Jury, for attending this trial. I said at the beginning that I thought you would find it to be an interesting experience, and I'm sure it was. The jury system is the purest form of self-government in the world today insofar as you have members of the community have a dispute being decided by members of the community. It's a very pure form of self-government.

We are privileged in a sense, too, because I didn't learn until yesterday the Judge here wrote the book on these trials and these types of cases. So this has been a very well-conducted and legally correct trial, and it's been a

privilege for me and it's just a great experience all around.

Now, the Judge has indicated we have the burden of proof. We have to prove by more likely than not, greater than 50 percent, that the claims being made by Mr. Sanford are true. It's my job right now to summarize the evidence as the plaintiff has interpreted it during this trial. Basically, I knew what the evidence was at the beginning of this trial, but I wasn't sure I was going to be unable to untangle the lies and deceit that has occurred during the progression of this case, so I didn't stick my neck out in opening statement, but you have seen what has occurred. You have seen the witnesses. You have seen the impeachment. You have seen the changed stories.

I saw an interrogator on television the other day and he was being questioned, "Why do you interrogate these people over prolonged periods of time? Why do you keep going back to them over a year or two," and the interrogator said, "Because lies do not remain consistent. The people forget and they forget their lies and you catch them over time." Name one witness who was up here on behalf of the defendant who wasn't impeached with a prior statement that was made at a deposition, because there's a lack of consistency in the defendants' case and a lack of credibility. The chain is only as strong as its weakest link, and you saw many weak links in this case.

You have a situation where you had -- when the word was that Mr. Sanford was going to need potential surgery,

then there was a preemptive strike made with a decision by the lawyer, as testified to by the claims agent, to undertake surveillance, to fire him, to cut him off from maintenance and cure, to file a peace bond against him, all these things. But for all those activities, you know that when he -- he didn't want to get off the vessel. He wanted to continue working. He wanted to try to work through it, as he had before. He didn't want to stop working. When he was getting treatment, he was eager and optimistic to return to work, but the rug was pulled out from under him. Once it became known he potentially needed surgery, then the preemptive strike was made. He might not be able to come back to work and might have some type of claim. He wanted to come back to work. Then the preemptive strike was made by the defendant.

Now, good things can come in small packages. The instructions to the jury, the questions at the end of this case are: Is this man entitled to maintenance and cure? Maintenance and cure is what is owing to a seaman any time he or she gets off a vessel with an injury or illness. It doesn't have to be accident related. It doesn't have to be fault or blame or anything like that. If a seaman gets off the vessel sick or injured, he is supposed to be paid maintenance, which is a living allowance, expenses and cure, which are his medical expenses. In this case we all know he got off that vessel on a medical with a sore back and it just developed to the condition

that it's in today.

You saw the testimony of Dr. Bomboy, who just got fed up with the cross-examination shenanigans that were trying to be perpetrated on him. You saw how upset he got. You saw that he said there's not an ounce of inconsistency or anything else with regards to this man's condition and that he needs surgery, and the longer that it is delayed the more likely he is going to get an unfavorable outcome. He testified that surgery in these types of cases should take place within three months. Three months. It's been two and a half years.

We make assumptions. Even with the voc rehab person, we made assumptions he might return to work at a lesser paying job, but he may not return to work at any job. The surgery might go wrong. We don't know. We don't know. Who put us in this position? The defendant put us in this position by not allowing him to get the necessary medical care. He wanted to do it. He was eager. He was optimistic. He was motivated. No, they pulled it out from under him. Good things come in small packages.

One question is: Is he entitled to maintenance and cure? The answer is yes. What is the rate of maintenance owing to this man? What should he be paid? For the elements of maintenance, the living and food allowance, you had the stipulated amounts that came into evidence a couple days ago for his mortgage and insurance and utilities, et cetera,

et cetera. Add it up and divide it. It's $35 a day. The question that you'll be asked: What is the rate of maintenance? That is $35 a day. That's all you answer there.

Once you determine that he is entitled to maintenance, then it's the defendants' obligation to pay maintenance until he has reached maximum medical improvement, and he is never going to reach that maximum medical improvement until he gets that surgery that the doctor talked about. So if you answer that he is entitled to maintenance, he will get the surgery. That's a good thing in a small package, $35 a day. The outstanding cure, what's the amount that Dr. Bomboy has been stiffed on? $1,486. That's what's outstanding in cure, maintenance and cure.

You're going to be asked: Was the withholding of maintenance and cure without a reasonable defense? The advice of a lawyer as opposed to a doctor to cut off maintenance and cure is inadequate. The claims agent testified that she did it on the advice of her lawyer sitting over here, Mr. Staines. "Cut this man off from maintenance and cure. Fire him. Surveil him. Do a peace bond on him." That's inadequate. If it's without a reasonable defense, the plaintiff is entitled to compensatory damages for the withholding, for the two years of torture that he has eaten these narcotic pills like candy every day, 10 or 20 of them, two years of unbearable pain, two years, making his likely

outcome of his surgery much worse. The compensatory damages for that, we contend the compensatory damages are $498,514, in other words, totaled with the absent cure, the outstanding medical bill, $500,000 against this defendant, this investment group, for depriving him of what he is otherwise entitled to.

You look at all the different things. You have company doctors telling you that he is obese. He is obese? This guy who was the weightlifter on the boat, he is obese? Al Hirt, rest in peace, was obese at a time, or Paul Prudhomme, the chef, that's obese. If he was obese, I think we are all in trouble. The bottom line was he was a fit working man, working his butt off, and he was entitled to a safe place to work. It was the defendants' boat that fell apart. It wasn't reasonably fit for its intended purpose. The bumper fell off.

You didn't hear anyone say he volunteered to do anything. He was the go-to guy. He was the guy who was working 300 out of 365 days a year. He was the guy that they put on the front of that towboat to lift that thing out of the water, to try to lift that thing out of the water with inadequate manpower. There probably should have been more men there. That's a species of unseaworthiness, inadequate manpower.

They brought in Jason, the other tankerman, who changed his testimony. How did he change his testimony? Well, he said, "Well, we didn't really try to lift it. We just tried

to wiggle it." Right. Right. But he testified before under oath that they tried to free and pull it up onto the towboat. That was his prior testimony under oath, and it felt like it weighed 250 pounds. How many times? Several times.

So what did he do? Well, he didn't stop it. What do you expect him to do at that point? His accident report says "my back," "has a sore back," not "it's killing me." "I have a sore back." The defendant criticizes him because he didn't say, "Time up. My back is hurt. I quit. I'm going home." You have all this stuff going on. He should be commended for keeping on and keeping on.

Then you get the captain in here. You get the captain in here saying, "Well, you know" -- you had a version of the New Orleans ghost tour here, when the claims agent was up there testifying, "I got anonymous phone calls." Well, that didn't come in. They went to the go-to guy. They went to the captain of the ship, and he comes in here and says, "Well, I called the office and said he said he is going to sue," and everything like that. Yeah, right. Tell me all about it.

You have the accident report here made by the captain and written by the captain that says, "Complete this with the condition of the injured party at the time the form is completed and any other information that you judge to be important." I said, "That's important, what you are telling us here today?" "Oh, yeah, it's important. Don't you think it's

important?" Yeah, if it was true, it would be important.

What does it say at the end here about this captain? This captain's signature, "The information included in this report is complete and accurate to the best of my knowledge," and that's where the captain signed it. There ain't nothing in here about no threats of anything. It's all made up. It's all made up. It's all made up just like he was fired for insubordination. That's all made up. He was fired because of a claimed fraudulent claim dreamed up by a defense lawyer here in consultation with the claims agent. He wasn't fired for any insubordination. It's not on any of the forms. That's all made up.

Mr. Gelvin came in here and said, "Well, the personnel manager who approved this firing for filing a fraudulent claim" -- but he testified he didn't know what the fraudulent claim was -- "was Chris Pike." They didn't bring him in to testify, did they? So I read his deposition. What did he say in his deposition? He said, the personnel manager, "I had no reason to fire him and I didn't recommend that he be fired." That was the testimony of the personnel manager. So this thing that he was fired for insubordination is all made up.

I'm not going to say he was a picnic to work with. It's like that movie *Heartbreak Ridge*, if you ever saw it, with Clint Eastwood right at the beginning. He is in the

Marines and he has got all the Marines walking around like this *(INDICATING)*, these big guys. That's what he was. He was getting the job done. This is not a tea party on these boats. This is rough, rugged, tough, dangerous work. He was the go-to guy. He worked 300 of 365 days a year, not 20 on and 10 off like everybody else. 35, 40, 50, 60.

What did it say? There was never anything that he disrespected -- he had these evaluations: Respect for other people, 10; needs supervision, 10, none. They try to chop his head off because he went to the doctor in August of 2003. He had mood swings, they say. This man was trying to deal with it. He went to the doctor. The doctor said he has some depression from working too much. He was trying to deal with his mood swings. He was trying to better himself. He should be commended. He did everything he could. Did you hear anything about anything where he was anything but a great worker? Nothing. Was there a concealment?

His testimony that the captain and pilot would just stay in the galley while the boat was up on the bank was unrebutted. Did you hear the captain or the pilot contest that? It was unrebutted. That's why they got stuck and that's why this whole series of events went into play. The captain says, "Well, yeah, I let McCranie, the deckhand, up there run the boat." What did McCranie say? I read his deposition. "I don't have any training. I don't stand on watch. I don't

operate the boat." He denied it flat out. The captain knew that the water was going to quickly fall out between 7:00 and 8:00 on December 14 in the morning. He knew it. He admitted he knew it, yet he didn't move it, not even once, between those two hours.

So it got grounded, it got stuck, and that information was concealed. It's supposed to be in the logbook. Nothing. Assist boat, supposed to be in the logbook. Nothing. Injuries, supposed to be in the logbook. Nothing. The Coast Guard can make unannounced inspections and inspect the logbook and find out because it was unreported to the Coast Guard like it's supposed to be. The 2692 report is supposed to be reported to the Coast Guard.

You get a picture of the mind-set of the defendant with regard to reporting things to the Coast Guard. You know what it says on the accident report? "No one is to give a statement to the United States Coast Guard until approved by the office. Failure to do this is grounds for termination." That's on the accident report. The captain is required to file these reports, 2692s. There was no 2692 filed in this case.

Then you have the grounding report. The captain testified there was a grounding report dealing with the circumstances of the grounding, which is what we are talking about here in this case. He testified that he did one. We

asked for the report, and the claims agent admitted that we asked for it, but they didn't turn it up. Then they talk about, you know, "We have an evaluation system." Well, where's the evaluations of him? Nowhere.

Was the defendant negligent in this case? Did the defendant fail to provide a safe place to work? The answer is yes. Starting out, the captain was derelict, failed to exercise reasonable care, was negligent in not keeping this vessel under proper direction and control by leaving the pilothouse, by staying in the galley, and getting it grounded, the only one that grounded out of the 10 or 15 ones there because he wasn't doing his job. Even their operations manual says that there's a danger of the tide receding; do everything in your power to keep it from getting grounded. He didn't. He didn't move it more than once an hour and he knew it was falling out. Was he negligent in that respect? Yes, he was negligent. The defendant was negligent.

Was the vessel unseaworthy? In other words, was it fit for its intended purpose? A piece of equipment that breaks or fails in the ordinary course of use can render a vessel unseaworthy. It doesn't have to sink. We have equipment failure here, and the equipment failure is that rubber tow knee that has to be on this boat, that has to be there in order for this towboat to legally push tank barges. This insulator that has to be there fell off under ordinary

use -- nothing special, just fell off -- rendering that vessel unseaworthy and causing injury because of that unseaworthiness.

A vessel can also be unseaworthy if too few crew members are assigned to a work activity. That can be a basis of negligence, also. There should have been more men sent out there, but he was the go-to guy. He was told what to do. He did his job. The defendant is going to argue that he was somehow at fault. Where is he at fault? He is following his directions. It's very simple to see how he was injured. He was injured, as he said, when he went up to the front of the towboat and they got down and at the waist they bent and tried to pull this thing up. That's how they were doing it. You couldn't bend your knees to do it. This is how Captain German pulled up to the bumper to try to get it out. They did it the only way they could, bending at the waist, trying to get it out, and he popped his low disk. That's what happened.

He reported it at the first available opportunity and there's nothing in the records that say that, you know, he was told he was getting off the boat or anything. He wasn't taken off the boat for insubordination like defense counsel told you at the beginning of this case, because Mr. Quebodeaux said that he was on there and he left even after he learned of this encounter with Mr. Cochran and the plaintiff. He didn't take him off the boat, and he wasn't going to be fired for that anyway. The captain said, "Well,

find another boat." Who knows? By the time the 10 days were up, they probably would have made up and they would be hunky-dory just like they said it happens all the time. He was taken off the boat once he said his back was sore.

The damages. What are the damages in this case? There are multiple elements of damage. For the past wages lost, Dr. Culbertson, $102,840. That's an element of damages on the verdict form.

Future damages. Considering that he would be able to get some light-duty job after he has surgery if it goes okay -- which every day that passes the likelihood of a successful outcome is gone. But assuming it goes okay, that's $771,397 lost. This was a working man.

Then you have past, present, and future physical pain and suffering. That's another element that you're asked to put your collective minds together to come up with an amount. Past, present, and future emotional pain and suffering and the loss of enjoyment of life, what do you have in that regard?

What do you have for physical pain and suffering? You have the sore back. You have the radiating leg pain. You have any pain on exertion. You have him eating pain pills like they are candy. How many times have you heard people getting back surgery and they don't get better or they get worse? How many times? His pain and suffering.

What about the other elements? Loss of enjoyment of life. Inability to help his dad farming. They had this guy with the camera stalking him for months. Stalking him for months. Did he stalk him over to his dad's place a couple miles down the road and do any farm work, this guy who is not hurt, who did farm work for his dad? Did they stalk him and get a picture of him doing that? Did they show us pictures of him going over to his dad's?

Loss of enjoyment of life. Loss of his fiancée. Loss of his kids. He couldn't pay the child support, so they had to move away. Emotional pain and suffering. Loss of his livelihood. Loss of being a working man. That's what he is. That's what he was, a working man. Now he is a broken working man. Loss of his dignity.

This man took pride in working 16 to 24 hours a day, and you didn't hear anybody contest that. Can you imagine that? I mean, who can do that? Who is the rare individual who can do that? Someone who does that, you know that's going to get you a little *(INDICATING)* just like the day when he supposedly blew up on R.D., Mr. Cochran. He is up for 24 hours. These guys are sleeping and getting up. He doesn't ask him to write down what he had the argument with R.D. about. They didn't ask him to write down how he was upset because they were watching TV all the time when they should have been operating the boat and that's why they were there.

Emotional loss of self-worth. The loss of his manhood. The loss of his identity. Emotionally just knowing that he can't do the physical work he used to do. Loss of enjoyment of life. Can't lift weights anymore, one of his outlets. You know, this pain behavior, you know how it is lifting weights. How many of us lift weights? We don't lift weights, basically, because it's too painful *(INDICATING)*. It's too painful. This isn't a guy -- and that's what he did. He is not a guy who is going to exhibit or grimace or show pain behavior like everybody else because he is used to enduring that intense pain from weightlifting and stuff like that. So he can take it, but he feels it.

The emotional loss of being a productive member of society. The emotional mental loss of the best chance he had. The loss of the best chance he had to get physically better because of having the rug pulled out from under him. How do you think that works on somebody's mind? The loss of enjoyment of the pride in being able to do that over time. The loss of enjoyment of the life on the river, which obviously he cherished. It's got its romantic aspects. He is out. He is doing something. It's different. It's different every day. He is doing it 300 days a year. You know he had to enjoy it.

The emotional loss of realizing at all times you are potentially being stalked. The loss of privacy. The emotional loss of being arrested based on false pretenses that

he is going to go cause physical harm to somebody eight months after he gets off the boat, four months after he has had all of his support and medical care taken away, when he has never even talked to anybody off the boat. What is he going to do, take a rowboat and go up to the boats and do something to somebody?

There's never been any physical contact with him and anybody, no physical harm ever, but they have him arrested on some phony peace bond. It's like in *The Godfather* where Sonny pulls up to the tollbooth and they "rat-a-tat-tat" him, and just for good measure they go out and give him a couple kicks, the guys that shot him. That's all it was for this guy was a big kick when he is down, to go out and file a false-pretense peace bond against him in August of 2004.

That's what's happened in this case. I learned it over these two years, but I didn't know if we would be able to unravel this thing in trial. We didn't talk about it too much in opening, but you saw it when all those witnesses got up there and you saw that something fishy is going on around here.

**THE COURT:** Three minutes.

**MR. O'BRYAN:** Thank you, Your Honor. We talked about the past and future wages lost. For physical pain and suffering, past, present, and future, for past, present, and future emotional and mental suffering, and for the loss of enjoyment of life, for each of those elements it's our contention that the compensatory amount should be $375,254 for

each of them because, in our opinion, when you add those all up -- not for the maintenance and cure, but just for this, for the injury case as it's now developed, when you add those all up, it comes to $2 million. The wrongful deprivation of maintenance and cure is separate all together. Just for this injury case, how it's left him, it's a $2 million case.

You know, there's a lot of devastation around right now and we all know it, but in time it's going to pass. There's been recent Congress things, whatever it is. I don't even know. Three, four years, it's going to pass, but this man, it's a permanent condition. He is 41 now. When he is 45 he is going to have the same back. When he is 50, 55, 60, when he is 80, he is still going to be living with the residuals of this. So he is entitled under the law to compensation for the negligence of his employer and for the unfitness, equipment failure of the vessel. That is what our contention is with regard to those claims.

Calling him all these fallacies that the defendant is trying to put on you:

He was obese? Like Arnold Schwarzenegger is obese.

He was put off from insubordination? False.

He was fired for insubordination? False.

He threatened to sue somebody? False.

He just wiggled the bumper with that deckhand

out there? False.

He faked an injury? False.

We were not provided with the grounding report and he claimed that is unimportant? False.

He volunteered to do it? False.

It was likely he was going to exert physical aggression toward any crew members? False.

It's our contention and we think that the evidence shows that the claims being made by Mr. Sanford for negligence and equipment failure or unseaworthiness are more likely true than not, and the damages he has suffered are more likely true than not, and this man is in need of medical care. The wrongful deprivation, the willful and intentional schematic, lawyer-dreamed-up deprivation of maintenance and cure was willful on behalf of the defendant. I would like to thank you.

**THE COURT:** Thank you, Mr. O'Bryan.

**MR. MATTESKY:** Good morning. Like Mr. O'Bryan, on behalf of all the parties in this case, I would like to thank you for your time, your attention, and in some instances -- especially with us counsel -- your patience in the presentation of this case. The role you play as a jury is a very important role both in our judicial system and our society, and on behalf of everyone I would like to thank you.

You have heard the evidence, you have seen the

evidence, Judge Feldman is going to instruct you on the law that applies in this case, and then you're going to go in the jury room and you're going to make a decision. The decision is going to be based on the evidence presented in this courtroom.

If you recall, during the opening statements I told you that Florida Marine has never disputed that Mr. Sanford on an MRI shows a herniation in his lower spine at the L5-S1 level, but the issues for you, as the jury, to decide today are issues of fault. Is anyone at fault for the medical condition that Mr. Sanford has? The other issue is truth. Is Mr. Sanford being truthful with his employer, with his doctors, and with you, the members of the jury, as to how that condition and when that condition started?

Now, you will recall when I was questioning Mr. Sanford I went through kind of a history, and isn't it interesting every time Mr. Sanford has something wrong go in his life it's somebody else's fault? When he was fired from his job of 10 years with Sanderson Farms because he was doing his job, it was the other driver's fault. When he was fired from his job at Sabine Towing in a confrontation with the relief captain, his superior, it was the relief captain's fault. He comes to work at Florida Marine and he is aboard the Motor Vessel CYNTHIA and he gets taken off that vessel because of personality conflicts with crew members, but it's all their fault.

Then he goes to work for Captain Joe Massey and he gets relieved of that job, but it's Captain Massey's fault. Then he is working with Captain Quint Morton and he gets relieved of that job, but it's Captain Morton's fault. Then aboard the FLORIDA EXPRESS in December 2003 he gets into a confrontation with his boss, his relief captain, Ricky Cochran, but it's all Ricky Cochran's fault. It's everyone's fault how he claims he injured himself retrieving the bumper. It's never Mr. Sanford's fault.

Is Mr. Sanford being truthful? Was he truthful with his employer? Was he truthful with his doctors? Was he truthful here in the courtroom this week? Let's look at a few things. I went through some of his employment history, his Sanderson Farms application. On there I pointed out -- and Mr. Sanford agreed -- that he admitted on that application that he had had a prior back injury and prior back pain, but he didn't put that on other applications. He didn't tell them about that. Later he does tell Dr. Yousuf that he had a prior back problem in August 2002 with the same complaints he is there to see Dr. Yousuf with, but when he goes to see Dr. Steiner he doesn't tell him that. When he sees Dr. Bomboy, he doesn't tell them that.

You know what else he doesn't tell the doctors? He makes absolutely no mention about the fact that four months before this alleged incident he is at the after-hours family

practice clinic in Hattiesburg for mood swings, depression, problems at work, reduced sexual desire; and that between Dr. Yousuf and Dr. Bomboy he sees Dr. Ross, a urologist, where he is having erectile dysfunction problems, mood swings, depression, fatigue, and other problems. He makes no mention of that. He doesn't tell that to Dr. Steiner either.

Now, each one of the doctors told you that when they get the information it's very important, when they are making a connection and making a diagnosis and connecting the complaints and the events together, that they need as complete a history as they can have, but Mr. Sanford didn't give a complete history. He was deceptive. It's important because you heard Dr. Bomboy testify -- you actually saw his video testimony -- and one of the questions was with regard to Dr. Ross. This is the question to the doctor. "Were there any findings or complaints, findings of Dr. Ross, that were significant to the condition that you were treating?" Now, Dr. Bomboy is the orthopedic surgeon Mr. Sanford selected. Dr. Bomboy said, "Dr. Ross gave his impression in April of 2004 of protein urea, which is protein in the urine. He did not give a reason for that. That can be related to an injury. He also diagnosed him as hypogonadism" -- that's small testicles -- and potentially has less hormones than usual. He diagnosed him as having fatigue and having erectile impairment.

The very next question by counsel -- and this is

Mr. Sanford's counsel-- "Are any of those conditions or symptomatology related to the conditions you were treating Mr. Sanford," and the doctor said, "Mr. Sanford never complained to me about any of those conditions. It's not impossible that a back injury, with a herniated disk, could bear causation into those conditions, as well. I mean, it's not common, but it's not uncommon for people to have severe back pain and/or have a herniated disk and have difficulty with impotence," conditions Mr. Sanford had before he claims he got hurt aboard the FLORIDA EXPRESS.

Now, Mr. Sanford, as I said, it's always someone else's fault. You know what? It was even the fault of the investigator who did the video tapes that the only days that he observed Mr. Sanford were Mr Sanford's good days. It's the investigator's fault that the only days he observed Mr. Sanford and videotaped him that Mr. Sanford was walking without a limp. Again, with the truthfulness, remember when he saw Dr. Steiner in March of 2004 and he said he had terrible pain from a bending position and that he always walked with a limp? Well, remember on the tapes that you saw -- and we're going to show another little snippet of those -- that he is not walking with a limp. You see him doing bending and squatting, doing all that work around his house, with no indication that he has been physically impaired. I would like you to take a look at Mr. Sanford walking there. Is he walking with a limp? We are

going to watch this for a little while, while I also tell you some more.

In order for Florida Marine to be responsible for the claims Mr. Sanford is making, someone at Florida Marine had to be negligent -- that means they had to have done something wrong -- and/or its equipment, its vessel, had to be unseaworthy in some manner, and the negligence and the unseaworthiness have to have had a connection to the injury Mr. Sanford claims.

Now, all this talk about the barge got hung up on the bank, that nobody filled out a report about a grounding, that somebody left the wheelhouse, all those events happened days before Mr. Sanford claims he got injured. You have heard Mr. Sanford testify. He says he got injured when he bent over and was trying to pull on the bumper. Well, now all those incidents that preceded this have no connection whatsoever to the claim Mr. Sanford is making in this courtroom today.

Well, Mr. Sanford says -- he is trying to tie in a whole lot of unrelated incidents. All of us have suffered through the Katrina event, and I'll tell you what. I'm sure you have had flat tires. You have had blown-out tires. A tire or a bumper serves a purpose. Have you ever driven your car and accidentally bumped the curb and you blow out your tire? Well, the tire was equipment, it was proper and in good shape for its condition but for an incident that happened that was

nobody's real fault; you just happened to bump the curb and the tire failed. Well, that's what happened with the bumper on the FLORIDA EXPRESS. They were using it in the normal course and scope of work and because of an incident the bumper got knocked off, but that has absolutely nothing to do with Mr. Sanford's accident.

Now, with regard to the actual activity that was under way, you recall you heard testimony from Captain German and Mr. Rogers on the LAGONDA that they discussed the procedure before they started, that they were going to use a line to wrap around the bumper, and they were going to use the power of the boat and the line to pull it out of the mud and hold the weight. Then Mr. Sanford came over and got involved and Mr. McCranie from the FLORIDA EXPRESS were involved. They had sufficient manpower. No equipment failed. The boat and the line held the weight. You heard the testimony of all the other individuals that that's how it was done. Then they eased the bumper down onto the LAGONDA and then they pushed or rolled it onto the FLORIDA EXPRESS. There was no lifting involved.

Even if there was some lifting, Mr. Sanford's job as a tankerman is somebody who is supposed to do heavy lifting, and he is a weightlifter, a heavy weightlifter. He says he routinely lifted weights anywhere from 200 to 350 pounds. There was nothing wrong with the FLORIDA EXPRESS. There was nothing wrong with the LAGONDA. None of the crew

members did anything that caused Mr. Sanford to be injured. You heard Mr. Rogers say they were just shaking the bumper, seeing if they could get it loose from the mud, but there was never any intention to lift it. No equipment failed that caused his injury. Mr. Sanford says he is bending over and he is pulling on the bumper. Sufficient manpower, a prudent employer, and a seaworthy vessel as far as the incident that Mr. Sanford is claiming.

Now, Mr. Sanford goes to the doctors, first the company -- he does report an accident, but remember the accident is reported after he has a confrontation, the last of a long series of confrontations with people in authority at his work. Florida Marine had transferred him several times. They gave him many second chances, but now he ran out of chances. The incident with Ricky Cochran was sufficient enough, at the end of a long line of events, that he was going to lose his job, and he knew that.

He never reported an accident during the whole time he was doing the procedure where he said he immediately felt burning in his back. He worked the rest of the day. He doesn't tell anyone he is working with that he got hurt. They don't observe him in any kind of physical activity that would suggest to them he was injured, but then he has a confrontation with his superior, Ricky Cochran, and then with his other superior, Captain Bufalo, and he is going to leave the vessel,

and only after of all that he comes in and says, I want to report an accident." Then he is offered medical attention right away, but he refuses it, but he tells you he is in pain and he is working through the pain.

The first thing his employer does -- a prudent, responsible employer -- because an injury has been reported, they send him to the doctor the very next day, Dr. Yousuf. He tells Dr. Yousuf he had prior back problems just a year before with the identical type of complaints. Dr. Yousuf examines him and based only on complaints from Mr. Sanford -- truthfulness -- he says, "He says he is hurting in his back. I have negative straight leg raising tests." That's something Mr. Sanford can manipulate. "I don't see anything else from a clinical standpoint that suggests to me an injury, but because he is complaining of pain I say he must have a back strain. He must have a muscle pull."

Then Florida Marine appoints Concentra, Charlene Fairchild, to monitor his medicals and make the appointments, and they pay him maintenance and they pay him advances and they pay for his medical treatment. As a prudent vessel owner, they also have an obligation -- because they also are not only in the course of looking into someone's claim of injury, but because there's a suspicion surrounding how it was reported and how it came about, they start an investigation.

They hire Mr. Aucoin to look into these matters.

He interviews all the crew and they tell a consistent story, with a few fluctuations, but that happens when you have five or six people's version of events. Not one of you could hear the same story and pass it down and by the time it got to the end would it be the same, but it's consistent on the facts that are important.

Secondly, Mr. Sanford picks Dr. Bomboy. They pay for Dr. Bomboy's visits. Then because Dr. Bomboy starts to suggest he might need surgery, a prudent employer -- common in the industry, common in all industry -- says, "We want a second opinion." Any one of us, if we were told we were going to get surgery, might want a second opinion before we have the surgery, something serious.

He goes to Dr. Steiner. You saw on the tape here when he was going to Dr. Steiner he is walking without a limp. You see later on he is bending and he is stooping without any pain. When he sees Dr. Steiner, he walks all the time with a limp. He can't get up from a bending position without pain. Just going through his daily life he is hurting. All those tapes where he's working around his house and he is riding the four-wheeler and he is mowing his grass and he is cutting shrubs and he is picking up trash and he is hauling buckets and trashcans, I don't see him limping. I don't see him showing any signs of pain. Do you?

Well, finally, after a very thorough

investigation, May of 2004 -- now, we are talking about an alleged incident in December of 2003. After all of this comes together and with their right to consult their counsel, Florida Marine decides Mr. Sanford is not being truthful with him. You know what else came out that was an indication that he wasn't being truthful? He went deer hunting after he claims he was in excruciating, incapacitating pain in January, a December incident, and the next month he is out deer hunting. Now, he has tried to indicate deer hunting is not strenuous and maybe that might be the case in certain situations, but you know what? Just walking through the woods, if you believe what pain Mr. Sanford was in, should have been difficult, and then he has been hunting since.

He also gets involved in a domestic confrontation where you heard Officer Massengale, who has absolutely no connection with any of the parties here, come in and testify that he is called in; Mr. Sanford's temper is so hot that he has picked up a ladder and is in the process of going to hit somebody with it until the officer intervenes. That's in February 2004, the same time Mr. Sanford is telling Dr. Bomboy, "I can barely get through the day because I'm in such pain." Then he sees Dr. Steiner in March and he is in pain, but he is doing things that don't seem to indicate he is incapacitated physically in any way or showing any signs of pain.

Finally, after that, Florida Marine comes to the conclusion that based on the years he has been with us and all the times we have given him second chances and now this, the icing on the case, we have to release this man. We can't have him in our employment any longer. You know what? They met their obligation as a prudent Jones Act employer in providing him maintenance and cure and investigating the claim until they reached that conclusion. The evidence is overwhelmingly in support of that conclusion that he was not being truthful. A long line of truthfulness and fault.

They didn't wrongfully deny him maintenance and cure. In fact, they provided it to him. They cooperated. They coordinated. They appointed someone else to watch over it. But after it was all said and done, after thoroughly investigating, they made a reasonable decision based on the evidence, the evidence that you have seen in this courtroom this week, that he wasn't being truthful, that he wasn't hurt aboard the vessel, that he is fabricating his claims.

We now know -- because Mr. Sanford has testified to it and the other documentary evidence shows it -- he has had prior problems with his back. He is a heavy weightlifter. He puts heavy weights over his shoulders. He does squats with the heavy weights. He does curls with the heavy weights. He lies on his back and pushes up the heavy weights. He said he even had a set aboard the vessel up to 310 pounds. That puts stress

on the back. That can cause injury to the back.

Now, you have heard all three doctors that have seen Mr. Sanford for his complaints of back problems -- Dr. Yousuf, Dr. Steiner, and Dr. Bomboy -- say you can have a herniated disk in your back and not have symptoms. It's rare, but it can happen. You have also heard from Dr. Bomboy that he was not provided with a complete picture.

Remember, when I gave the opening statements, I told you something significant about the medicals. If you look through all of Dr. Bomboy's reports and listen to his testimony, it's always "Mr. Sanford complained of back pain," "Mr. Sanford complained of leg pain." Mr. Sanford, according to Dr. Bomboy, had some straight leg raising during some of the examinations -- the early examinations -- they were negative. Dr. Bomboy says, "It's hard to fool me, but I'm not saying somebody cannot fool me with the straight leg raising." All they are doing is raising the leg to a certain point the person says, "That hurts." That is not an objective medical finding.

What are objective medical findings with regard to low back injuries, particularly where the nerves are involved? And, remember, I told you this:

Are you neurologically intact? Every visit with Dr. Bomboy and every other doctor, Mr. Sanford was neurologically intact.

Are your reflexes affected? Every visit with

every doctor who saw Mr. Sanford all the way through and every office visit with Dr. Bomboy, Dr. Steiner, Dr. Yousuf, his reflexes were intact.

Was there any muscle loss in the legs because of nerves being damaged or impacted in some way by the herniation? You know what? Every single doctor and all the visits, when there was a mention with regard to muscle, the muscles in the legs, there was no muscle loss. There's none today.

Now, you also heard Mr. Sanford say he is walking with a cane and he walks with a limp and he is being very, very active on these tapes because that's from his doctor's orders. Go back and look. The first time the doctor ordered him to be active and do things around his house was in May. May 3, 2004, after these videotapes were taken.

Mr. Sanford says, "I'm only doing what my doctor tells me I can do, but I can't work." He brings an economist to say, "I can't do any of my household chores." Cutting shrubs, mowing grass, sweeping the porch, washing the cars, those aren't household chores?

I would like to talk about the damages. First of all, it is our contention that Mr. Sanford has not met his burden of proof. He has not shown that Florida Marine, its employees, or its equipment in any way caused his accident as alleged or in any way caused the medical condition that he claims. But in the event you should find there is a causal

connection, we do need to talk about damages. We, again, contend he is not entitled to anything from Florida Marine for what he is claiming, but if you have to consider these -- first of all, you heard Dr. Culbertson testify. All his numbers are mixed up. They have no relevance because they weren't consistent. He used wrong information. He took things in. He put things out. Remember, he talked about $65,000 for household services lost? Mr. Sanford is doing all those things right now.

The person you should look to is Dr. Boudreaux and, again, it's only as guidance. At most, Dr. Boudreaux says Mr. Sanford's loss, if any -- and, again, we contest that -- is about $100,000 for lost wages. You remember, you heard some testimony Mr. Sanford as a tankerman -- and you heard several of the crew say they started out as deckhands, went to tankerman, worked their way up to pilot or captain. There are jobs out there in the industry as a pilot or captain and they pay money equal to or greater than the amount of money that Mr. Sanford was making and they fit a job clarification of light duty, something Mr. Sanford could do.

So Mr. Sanford has sustained, we contend, no economic loss as a result of any of this because: (1) Florida Marine nor its vessels had any involvement in what he is claiming happened; and (2) he is capable of going back to work at or above what he was making.

You are going to be provided by the Court what's called a verdict form. The very first question you are going to be asked to address on that says, "Do you find from a preponderance of the evidence" -- that means just over 50 percent -- "that defendants were negligent under the Jones Act and that such negligence was a legal cause of the injury to plaintiff, Michael Sanford," and you will have to make a choice, "Yes" or "No." We contend that the evidence is overwhelming there is no negligence on the part of the defendant and the answer should be "No."

Then you will turn to number 4 on that verdict form and it says, "Do you find from a preponderance of the evidence that the vessel, the M/V FLORIDA EXPRESS, was unseaworthy and that such unseaworthiness was the proximate cause of plaintiff Michael Sanford's injuries?" We contend to you the evidence you have heard in this courtroom is overwhelming that the answer is "No." There is no connection to claims that Mr. Sanford has made as to how he got injured, leaning over and tugging on the bumper, when he felt the burning sensation in his back, that was anything wrong. He didn't ask for any help. There was sufficient help, from all the other testimony. There was no equipment failure. He was doing his job. All the other members were doing their job. There was nothing that caused him to be injured as a result of negligence or unseaworthiness.

I again want to thank you for your attention throughout this trial and wish you the best of luck. Thank you.

**THE COURT:** Thank you, Mr. Mattesky.

Mr. O'Bryan, you have some rebuttal time.

**MR. O'BRYAN:** Yes, Your Honor. You hear the adage truth is stranger than fiction or you wonder where John Grisham gets all these ideas for these novels he writes about this legal stuff, and you see it and you have seen it firsthand here today.

**THE COURT:** Push that a little bit farther away so it's out of the way of the jury. Thank you.

**MR. O'BRYAN:** Let me go through these things. Dr. Steiner, even defendants' own doctor, never said that Mr. Sanford was not injured. He never said that he was at maximum medical improvement. He never said that he did not have a herniated disk. He never said that it was not a result of the accident on the vessel. Dr. Steiner never said that.

Dr. Steiner said that his observation of Michael Sanford was that he had a mild antalgic gait. A trained clinician. I thought the defendant was going to put -- remember, he talked to you, "Remember, Mr. Sanford, when the claims agent came up and gave you that check?" Then he told you, "You started limping then, didn't you," and I was waiting for him to play that. I thought he was going to play something

like that today. Where's the beef? Mr. Sanford was waiting to go to the orthopedic doctor selected by the defendant. He waited two or three weeks for the claims agent to find him an orthopedic doctor. They said, "I can't find one in Hattiesburg." He picked up the phone and found one in two minutes. He was playing the game as they directed. He was doing what he was told. He wanted to go to their doctor. They wouldn't give him one, so he went out and got it on his own.

Now, we all know about these domestic disturbances. I don't know what happened there. They are heated. People's tempers flare. I don't know what happened there. I didn't put Mr. Sanford up for rebuttal, "Well, what happened there?" "Well, my aunt," this and that, but I can just tell you one thing. I can tell you one thing. Have you ever heard of a police officer or a deputy testify without -- without -- an accident report right there to back up what was being testified to? Did you see this defendant enter into evidence any report, accident report? He said there was one, but nothing was produced. Have you ever heard of that? I know what I think what's going on, but I'm not going to go there. The bottom line is that he was arrested at that point in time because of this phony peace bond.

He is not saying it's everybody's fault he was fired, or this or that, or this or that. As a matter of fact, just about everybody on this boat has been fired from jobs

before. It seems like to be an industry requirement or something like that. This Ricky Cochran, three times he got fired from FMT. He just told his side of the story. That's all. He told his side of the story. You believe it or not. That's all he did was tell his side of the story. There's two sides to every story. You didn't get the other side when this Ricky Cochran made out this report. Where did they ask him to write down about what he was complaining about, them guys being in the galley, in the kitchen, instead of manning the wheel?

He says there's no relationship to them getting grounded and him getting hurt. More preposterous than that, he says there's no relationship between the bumper falling off and him getting hurt. He says there was enough manpower there. Read the accident report. "The PIC on the LAGONDA" -- that's Jason -- "and I pulled the push knee bumper halfway on front of the LAGONDA and had to let it back in the water. It was too heavy." Was there enough manpower? No.

They have to provide adequate equipment and supervision and procedures. Was it right or smart for the captain to just pull the towboat up to the push knee or the bumper and have these guys lean over from the back, bend over at the waist to pull it up? No. He should have done it the equipment way from the get-go, from the outset, not after this guy injured his back. At that time it was just a sore back.

This erectile dysfunction. He says, "Well, that

could be from an injury or impotence. It's from an injury," but the doctor testified it's from low testosterone. This was in April of 2004. The videos. Watch the videos in the jury room if you need to. You have seen these videos ad nauseam, as they say in legal terms. I'll agree with defense counsel this bumper was being used in the normal course of work. Yeah, it was being used in the normal course of work and it fell off. It was unfit for its intended purpose. It rendered the vessel unseaworthy. He says that has nothing to do with the injury. It has everything to do with the injury.

He has had many second chances. Where's that discharge report, employee notice, second warning? That's as phony as a $3 bill. Any warnings have to be in writing, and they didn't have anything. It's as phony as a $3 bill. Never had a second chance. They had no disciplinary procedures in effect at all. Basically, "We want you out of here because you need surgery." They fired him months after this incident occurred. He wasn't fired after his Cochran deal. He wasn't going to be fired. They said, "We'll switch the boat." By the time this hitch was up, 10 days, they probably would have made up anyway, the way they did every other time.

He went to Concentra. Yeah, he went to Concentra. What did she say? "He was eager to get back to work. The doctor's medical treatment is within the protocols." She testified, Charlene Fairchild, there's no fakery in this

man.

What does defense counsel say? "It wasn't until May 3, 2004, the doctor told him to do what he could around the house." I didn't hear him ask the doctor that. I haven't even looked at Dr. Bomboy's records, so I'm not going to argue about that. Did he say that to Dr. Bomboy, "Well, you didn't tell him until May 3"? No. Dr. Bomboy told us in this deposition what he told him to do, do everything he can, don't shrivel up and die, and that's what he did.

Then we got a real good one a minute ago. "He went deer hunting." Yeah, he has a "shoot house," he calls it, a treehouse where he goes in there and hunts. What does he say, tramping through the woods? You didn't hear a speck of testimony that he went tramping through the woods. Not a speck. He offered to give him pictures of his treehouse; remember? He didn't want them, remember, but he wants you to believe otherwise.

He says, "Oh, you can have a herniated disk in your back with no symptoms." That's not what Dr. Bomboy said. He said people have herniated disks in their neck without symptoms, older people, 30 to 40 percent. In the back, it's much more rare, and you're going to have a sore back either way you cut it if you have a herniated disk in your back.

Dr. Bomboy said he is the most credible patient he ever had. That's what he said. *Neurologically intact* means

his nerve hasn't been damaged even though it's being pinched. The defendant would -- what do you want? Do you want it damaged? Do you want the guy to end up a cripple? How close is he getting there now, being delayed this medical care?

Then all I heard the economist Boudreaux saying is that he agreed with Dr. Culbertson on this economic thing when he was up there. How many times did he say it? "Well, I just agree with Dr. Culbertson." "I just agree with Dr. Culbertson." Dr. Culbertson did this, Dr. Culbertson did that, so we used Dr. Culbertson's analysis as a guideline. With that analysis, the conclusion is inescapable of the amount of lost past and present or future earnings; and that's if he ever becomes actually employable again after this surgery, if the surgery goes right. We all know how these kind of back surgeries are. We all know people who have had back surgery and they are worse off, but that's *if*. We will make that assumption.

They put him in this position, and that's the compensatory damages for the failure to pay maintenance and cure without a reasonable defense. If you determine that the failure to pay maintenance and cure was willful and arbitrary, which it was -- no advice of any doctor, the advice of a lawyer, which is inadequate -- then you can also find that the defendant is responsible for Mr. Sanford's attorney fees because he shouldn't have had to bring this stupid case. He

should have been able to get well and get back to it.

We shouldn't have even been here today. But for the defense lawyer firing, termination of maintenance and cure, surveillance, peace bond, and everything else, he would have probably been back to work. The old man, Mr. Dennis, wasn't even aware of what was going on. Who knows what he thinks this is all about. They fired him. They cut him off. Like the guy said yesterday, Gelvin, "I don't know. I didn't make him aware of it."

You have a broken man here through no fault of his own because of an unseaworthy vessel, broken equipment failure, and a captain who was derelict at his duty of not properly controlling his vessel and getting barges stuck by staying in the galley. Because of that equipment failure and that negligence and putting two men to lift something out of the water and it being too heavy, he is here today, and he is going to be that way and worse for the rest of his life. So that's the case.

On behalf of defense counsel, I'm sure we all appreciate your attention. You've been a great jury. I hope that the deliberations are somewhat enjoyable and interesting for you. Thank you very much.

**THE COURT:** Thank you Mr. O'Bryan.

Let me add my thanks. It's been a great. pleasure to work with you, especially post-Katrina, when I know

everybody has a lot of other things on their mind.

Well, you have heard the evidence in the case and it's now my duty to instruct you on the law that you must apply. As jurors, it is your duty to follow the law as I give it to you, but you are the judges of the facts. Don't consider any statement that I may have made in the course of the trial or anything that I might say in these instructions as an indication that the Court has any opinion about the facts of this case. As I stressed at the beginning of the trial, I have no opinion about the facts of this case. Moreover, do not let bias, prejudice, or sympathy play any part in your deliberations.

Let me stress, as I think I already must, that a corporation -- the defendants here -- a corporation and all other persons are equal before the law and must be treated as equals in a court of justice.

Now, having determined the facts from the evidence before you, it's your duty to follow the rules of law which I will state in these instructions in reaching your verdict. You are not to single out any one single instruction alone as stating the law; that is, you must consider all of these instructions as a whole.

The plaintiff, Mr. Sanford, need prove his case only by what we call a preponderance of the evidence. So he need not produce every possible witness and he need not prove

his case beyond a reasonable doubt, as is necessary in a criminal prosecution. However, speculation or mere possibility and even unsupported probability is not sufficient to support a judgment in his case.

You must answer all questions in the verdict form from a preponderance of the evidence. Now, what does *preponderance of the evidence* mean? It means the greater weight and degree of the believable or credible evidence before you. In other words, a preponderance of the evidence means the amount of evidence that persuades you that a claim is more likely so than not so. More likely so than not so.

In determining whether any fact has been proved by a preponderance of the evidence, you may, unless otherwise instructed, consider the testimony of all of the witnesses, the depositions, as well as the people who testified here in court, and you may consider that testimony regardless of who might have called that witness. You may also consider all of the exhibits received in evidence and used during this trial, again, regardless of who may have produced the exhibit.

During the course of the trial, I instructed you that certain testimony and perhaps certain exhibits were admitted into evidence for simply a limited purpose, and I instructed you that you may consider some documents as evidence against one party but not another. That really hasn't happened here because all of the defendants have agreed that they are

each responsible to the other for business reasons, not for any other reason.

You may consider such evidence only for whatever limited purpose that it might have been admitted. In determining the weight that you give to the testimony of a witness, ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact or whether there was evidence that at some other time the witness said or did something or failed to say or do something that was different from the testimony the witness gave here in trial.

Keep in mind, of course, that a simple mistake by a witness doesn't necessarily mean that the witness was not telling the truth as the witness remembered it. People forget some things or remember other things inaccurately, and we all do it. So if a witness made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory. The significance of that may depend on whether it has to do with an important fact or only with an unimportant detail.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of your own common experience. In other words, you may make deductions and reach conclusions that reason and

common sense lead you to draw from the facts that have been established by the testimony and the evidence in this case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if, after considering all of the other evidence, you believe that single witness.

Remember that there are two types of evidence that you may consider in properly finding the truth as to the facts of this case: One is direct evidence -- the testimony of an eyewitness; the other is indirect or circumstantial evidence, proof of a chain of circumstances that indicate the existence or nonexistence of certain other facts. As a general rule the law makes no distinction between direct or circumstantial evidence. It simply requires that you find the facts from a preponderance of the evidence of all the evidence, both direct and circumstantial.

Now, we have had a bunch of opinion testimony from witnesses. When knowledge of a technical subject matter might be helpful to the jury, one who has special training or experience in that particular technical field is permitted to state his or her opinion on those technical matters. However, you're not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely on such testimony. When deciding whether to accept or rely upon the

opinion of some particular witness, you may consider the bias of that witness, including any bias which you may infer from evidence that the witness has or will be paid for reviewing the case and testifying, or from evidence that the witness testifies regularly and his income from such testimony represents a significant portion of that income.

Now, let's get to some particulars. I've given you some general instructions which pretty much apply in every single jury case. Michael Sanford, who is a seaman under the law, is asserting three separate claims against the defendants in this case. His first claim is under a federal statute known as the Jones Act. That is that his employer was negligent and that his employer's negligence was a cause of the injuries he claims he sustained in December of 2003.

Mr. Sanford's second claim is different from the fact that his employer was negligent. This deals with the vessel, not employer negligence. It deals with the claim of unseaworthiness of the vessel itself. The vessel was owned by two of the other defendants and operated by -- it was owned by one and operated by another one. So the three defendants are the Jones Act employer, the owner and operator of the allegedly unseaworthy vessel.

The plaintiff's third claim is what we call maintenance and cure.

Now, you have to consider each of these three

claims separately. They are all different, but the plaintiff is not required to prove all three claims. He may recover if, in your mind, from the evidence, he proves any one of the three claims. But he may only recover those damages or benefits that the law provides for the claims that he proves. He may not recover the same damages or benefits more than once.

Let's first talk about his first claim, the federal statute known as the Jones Act. Under the Jones Act, Michael Sanford must prove that his employer was negligent somehow. Negligence is the doing of an act that a reasonably prudent person would not do or the failure to do something that a reasonably prudent person would do under the same or similar circumstances.

Let me stress the occurrence of an accident, standing alone, even if you find some accident occurred, does not mean that anyone's negligence caused the accident.

In a Jones Act claim, the word *negligence* is given a liberal interpretation. It includes any breach of duty that an employer owes to his employees who are seamen, including the duty of providing for the safety of the crew. Under the Jones Act, if the employer's negligent act caused Mr. Sanford's injury, in whole or in part, then you must find that his employer, one of the defendants in this case, is liable under the Jones Act.

Negligence under the Jones Act may consist of a

failure to comply with a duty required by law. Employers of seamen have a duty to provide their employees with a reasonably safe place to work. If you find that Mr. Sanford was injured because the defendants failed to furnish him with a reasonably safe place to work and that the plaintiff's working conditions could have been made safe through the exercise of reasonable care, then you must find that the defendants were negligent.

The fact that some defendant conducted its operations in a manner similar to other companies is not conclusive as to whether or not there was negligence. You must determine if the operation in question -- getting this bumper out of the stuck mud -- if the operation in question was reasonably safe under the circumstances. Was the operation at issue, according to the evidence that you have heard in this trial, reasonably safe under the circumstances?

The fact that a certain practice has been continued for a long period of time doesn't necessarily mean that it is reasonably safe under all circumstances, and a long accepted practice may nevertheless be an unsafe practice. However, a practice is not necessarily unsafe or unreasonable merely because it injures someone.

A seaman's employer is legally responsible for the negligence of one of his employees while that employee is acting within the course and scope of his employment. This deals with the question of the coworkers and whether you find

from the evidence any one of the coworkers who were working with Mr. Sanford may have been negligent in helping to get this knee bumper up out of the mud.

So if you find from a preponderance of the evidence that the defendant assigned the plaintiff to perform a task that he was not adequately trained or adequately equipped to perform, you must find that the defendants were negligent.

Let's turn to the second claim, that the vessel was unseaworthy and that that unseaworthiness caused the injury. Even if this wasn't negligence, you have to separate out these claims. There's different elements for each of the three claims. In this second claim, Mr. Sanford seeks damages for a personal injury he claims was caused by the unseaworthiness of the vessel, the FLORIDA EXPRESS.

A ship owner owes to every member of the crew employed on the vessel the absolute duty to keep and maintain the ship and all its decks, passageways, appliances, gears, tools, parts, and equipment, all of that, in a seaworthy condition at all times.

What is a seaworthy vessel? A seaworthy vessel is one that is reasonably fit for its intended use. The duty to provide a seaworthy vessel is absolute. That means the owner of a vessel can't delegate its condition, its seaworthiness, to someone else. Liability for an unseaworthy condition does not in any way depend on negligence or fault or

blame.

In the first claim, in a Jones Act claim, Mr. Sanford has to prove that his employer was negligent; a failure to do or not do something that a reasonable person would do under the same or similar circumstances. In the unseaworthiness claim, Mr. Sanford does not have to prove any negligence or fault or blame. If an owner of a vessel does not provide a seaworthy vessel -- a vessel that is reasonably fit for its intended use -- no amount of care or prudence excuses the vessel owner.

The duty to provide a seaworthy vessel includes a duty to supply an adequate and a competent crew. A vessel may be unseaworthy even though it has a numerically adequate crew if too few persons are assigned to a given task.

The owner of a vessel is not required to furnish an accident-free ship. He is required to furnish a ship that is reasonably fit for its use. The ship owner need only furnish a vessel and its appurtenances, as I just said, that are reasonably fit for their intended use and a crew that is reasonably adequate for their assigned tasks.

So what is reasonable is sort of a common thread that runs through this, the operative standard in the first two claims that I'm giving you instructions about now.

The ship owner is not required to provide the best appliances and equipment or the finest of crews on the

vessel. The owner is required only to provide gear that is reasonably proper and suitable for its intended use and a crew that is what? Reasonably adequate.

In summary, if you find that the owner of the FLORIDA EXPRESS did not provide an adequate crew of sufficient manpower to perform the tasks required or if you find that the vessel was in any manner unfit, in accordance with the law as I have just explained it to you, and that this was a proximate cause of the injury claimed -- a term I will explain to you in a few minutes -- then you may find that the vessel, the FLORIDA EXPRESS, was unseaworthy and that the vessel owner is liable, and you may do so without considering any negligence on the part of the defendant or the employees. Negligence is reserved for the Jones Act. However, if you find that the vessel owner, the owner of the FLORIDA EXPRESS, had a capable crew and appliances and gear that were safe and suitable for their intended use, then the vessel was not unseaworthy and the defendant is not liable to Mr. Sanford on the claim of unseaworthiness.

Now, I used the phrase *proximate cause*. Not every injury that follows from an accident necessarily results from it or was caused by it. The accident must be the cause of the injury. As I said to you a couple times, not every accident is necessarily the cause of the injury. In determining causation, however, we have two different rules:

We have one rule for the Jones Act claim, the negligence claim; and we have another rule for the unseaworthiness claim, the unfit for intended use and purpose.

Under the Jones Act, for both the employer's negligence and for any claim of contributory negligence on the part of Mr. Sanford -- which I will tell you about -- an injury or damage is considered caused by an act or failure to act if the act or omission to act brought about or actually caused the injury or damage in whole or in part. Under the Jones Act, if the act or omission brought about or actually caused the injury or damage in whole or in part, then you have causation under the Jones Act.

It's different on the unseaworthiness question. There Mr. Sanford must show not merely that the unseaworthy condition was a cause of the injury, but that the unseaworthy condition was a proximate cause of the injury. This means that Mr. Sanford is obliged to prove that the condition in question played a substantial part in bringing about or actually causing his injury and that the injury he claims of was either a direct result or a reasonably probable consequence of his condition.

I promised I would tell you about contributory negligence. The defendants contend Mr. Sanford was himself negligent in getting the bumper out of the mud and that his negligence, his own negligence, caused or at least contributed, in whole or in part, to causing this injury that he is

complaining about. It's called the defense of contributory negligence, and the defendants have the burden of proving that Mr. Sanford was contributorily negligent.

If Mr. Sanford was guilty of contributory negligence that contributed to his injury, he nevertheless may recover, but the amount of his recovery will be reduced by the extent of his own negligence. In other words, he won't be rewarded for anything that might have been caused in whole or in part through his fault.

A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman's employment include not only his reliance on his employer to provide a good, safe working environment, but also on his own experience, training, and education. In other words, under the Jones Act, a seaman has the duty to exercise that degree of care for his own safety that a reasonable seaman would exercise in like or similar circumstances.

If you find that the defendants were negligent or that the vessel was unseaworthy and that the negligence or unseaworthiness was a legal cause of Mr. Sanford's injury, but you also find that the accident was due partly to the contributory negligence of Mr. Sanford himself, then you must determine the percentage the plaintiff's contributory negligence contributed to the accident. You will provide that

information by filling in the appropriate blanks in the special interrogatories in the verdict form that we are going to give you.

Don't make any reduction in damages that you award to Mr. Sanford, if you award any. The Court will reduce those damages awarded by you by the percentage of contributory negligence that you assigned to Mr. Sanford, unless, of course, you find that he was 100 percent negligent.

We are going to turn to damages in a moment, but if Mr. Sanford has proven his claim against the defendants by a preponderance of the evidence, you obviously must then determine the damages to which he has been entitled.

You should not interpret the fact that I am going to give you instructions about damages as an indication in any way that I believe that he should or should not win this case. Again, I have no opinion. If you think I've some opinion, it doesn't make a bit of difference. You're the judges of the facts of this case. It's your task first to decide whether the defendants are liable. I'm instructing you on damages only so that you will have guidance in the event you do decide the defendants are liable and that Mr. Sanford is entitled to recover some money from them.

If you find the defendants are liable, you must award the amount you find by a preponderance of the evidence as full and just compensation for all of Mr. Sanford's damages.

These are called compensatory damages. Compensatory damages are not allowed as punishment against someone, and they can't be based on speculation because it is only actual damages, what we here are calling or referring to as compensatory damages, that are recoverable in cases like this. So there are no punishment damages, only damages to try to make Mr. Sanford whole, if you find he is entitled to damages.

Here comes another, however. Compensatory damages are not restricted -- are not restricted -- to actual loss of time or money. Compensatory damages include both the mental and physical aspects of injury, both tangible and intangible. They are an attempt to make Mr. Sanford whole, or to restore him to the position he would have been in if the accident had not happened.

You should consider the following elements of damages to the extent that you find that he has established such damages by a preponderance of the evidence: You may consider physical pain and suffering, including physical disability, impairment, and inconvenience, and the effect of Mr. Sanford's injuries and inconvenience on the normal pursuits and pleasures of life. You may consider mental anguish and feelings of economic insecurity caused by disability. You may consider income loss in the past and you may consider impairment of earning capacity or ability in the future, including impairment in the normal progress in the plaintiff's

earning capacity due to his physical condition. You may consider his past medical expenses. You may consider the reasonable value, not exceeding actual cost, to Mr. Sanford of medical care that you find from the evidence, if any, that will be reasonably certain to be required in the future as a proximate result of the injury in question.

Some of these damages, such as mental or physical pain and suffering, are intangible things about which no evidence of value is required. In awarding damages like mental or physical pain and suffering -- what we call awarding intangible damages -- you are not determining some sort of precise value; but you should, on the other hand, consider only an amount that will fairly compensate Mr. Sanford for his injuries.

Any award that you make to him is not subject to income tax. Neither the state nor the federal government will tax the award. So you should determine the amount Mr. Sanford is entitled to receive without considering the effect of taxes upon it.

All of us mentioned past and future damages, important elements of compensatory damages. If you find for Mr. Sanford, he is entitled to recover an amount that will fairly compensate him for any of the lost wages that he has suffered thus far up until now. But what about future damages? That's a little more complicated, and we have heard some

economic testimony. If you find that Mr. Sanford is reasonably certain to suffer damages in the future from his injuries, then you should award him the amount you believe would fairly compensate him for his future damages. An award of future damages necessarily requires that payment be made now for a loss that the plaintiff will not actually suffer until some future date.

If you should find that Mr. Sanford is entitled to future damages, including future earnings, then you must determine what that present worth is in dollars of the future damages; in other words, how much is X dollars worth today, considering that the award is over a period of 10 years and that he won't get that money or he wouldn't ordinarily get that money immediately.

If you award damages for loss of future earnings, you must then consider two factors: First, you should reduce any such award by the amount of the expenses the plaintiff would have accrued in earning that money in the future; and, secondly, if you make an award for a future loss of earnings, you must reduce the award to present value by considering the interest that the plaintiff could earn on the amount of the award if he made a relatively risk-free investment.

The reason why you must make this reduction is because an award of an amount representing a future loss of

earnings is more valuable to the plaintiff if he receives it today than if he received it in the future, when he would have otherwise earned it. It's more valuable because he can earn interest for it from the period of time from the date of the award and the date that he would have ordinarily earned the money in the future. So you should adjust the amount of any award for future loss of earnings by the amount of interest that the plaintiff can earn on that amount in the future.

If you make an award for future medical expenses, you should adjust or discount the award, as I just instructed you to do, as far as loss of future earnings. I think one of the economists used a two percent figure. I don't recall what the other one used. You're not bound by that, as I have said. The discount figure is even for you to determine in your own deliberations. However, you must make any adjustment to present value for any damages that you award for future pain -- I'm sorry, excuse me. I misspoke. I have just been talking about medical expenses and lost future earnings. Let's put what I'm about to say in proper context.

I am now going to return to the intangible damages for pain and suffering. You must not make any adjustment to present value for any damages that you may award for future pain and suffering or for future mental anguish, as distinguished from future loss of earnings. Are we clear on that? Any question about that? I apologize for misspeaking.

Now, there has been some comment about Mr. Sanford lifting weights, Mr. Sanford having a prior back condition or other medical conditions. You may award damages for aggravation of an existing defect or disease resulting from an injury to the plaintiff. The burden of proof is on the defendant to prove the existence of some preexisting condition. If you find that there was an aggravation of a preexisting condition, you should determine, if you can, what portion of the plaintiff's condition resulted from the aggravation and make allowance in your verdict only for the aggravation. In other words, he can't recover for the entire condition, only for the aggravation of that condition by this accident, if you find that there was causation.

Now, there are a bunch of defendants in this case, but they're all in the same pot, so don't worry about separating one out from the other if you decide Mr. Sanford should win. Just let me stress again that he can't recover twice for the same damages.

Now, we have talked about the Jones Act. We have talked about unseaworthiness. We have talked about causation and contributory negligence. We have talked about multiple elements of damages that accompany every one of these kinds of cases. So much for the first two of Mr. Sanford's claims. Let's now, finally, turn to his third claim, what we call entitlement to maintenance and cure.

Mr. Sanford's claim, as a seaman, is he is entitled to recover maintenance, a claim that is separate and independent from both the Jones Act and his unseaworthiness claims. You must decide this claim separately from your determination of the Jones Act and unseaworthiness claims.

Maintenance and cure may not be reduced because of any negligence on the part of the seaman. Maintenance and cure provides as follows to a seaman: If a seaman is disabled by injury or illness in the service of his vessel, medical care and treatment and the means of maintaining himself while recuperating is his entitlement. If a seaman is disabled by illness or injury in the service of his vessel, he is entitled to maintenance (food and lodging) and cure (medical expenses) while recuperating until he reaches maximum medical improvement.

A seaman is entitled to maintenance and cure even though he was not injured as a result of any negligence or any unseaworthy condition of the vessel. Maintenance and cure does not rely on or focus on negligence or unseaworthiness. Was he a seaman? Yes. Did he become disabled in the service of his vessel by virtue of an illness or an injury? If so, whether or not the vessel was unseaworthy, whether or not there was negligence which caused all this, he is entitled to food, lodging, living, and medical care until he reaches maximum medical improvement. After that he is not entitled to

anything.

So, to recover maintenance and cure, Mr. Sanford need only show that he suffered an injury or illness while in the service of the FLORIDA EXPRESS without any willful misbehavior on his part. Obviously, we don't reward people for their own misbehavior. The injury or illness need not even be work-related. It need only occur while he is in the service of the ship, and it may not be reduced -- maintenance and cure again, may not be reduced because of any negligence on the seaman's part.

The cure to which a seaman may be entitled includes the cost of medical attention, including the services of physicians and nurses, as well as the cost of hospitalization, medicines, and medical apparatus. However, the employer does not have a duty to provide cure for any period of time during which a seaman is hospitalized and the employer is paying for it. In other words, you're not going to pay the seaman twice. If the employer is paying cure, paying medical expenses, then the seaman is not entitled to cure. He might still be entitled to lodging if he is not hospitalized, and to food expenses if he is not hospitalized; but if he is, he is not going to get paid twice.

Maintenance is the cost of food and lodging and transportation to and from a medical facility. A seaman is not entitled to maintenance for that period of time that he is an

inpatient in a hospital, again, because the cure provided through hospitalization includes both food and lodging.

A seaman is entitled to receive maintenance and cure for how long? He is entitled to receive it from the date he leaves the vessel until the point at which he reaches what we call maximum cure. So what is maximum cure? Maximum cure is the point at which no further improvement in the seaman's medical condition is reasonably expected.

So if it appears that a seaman's condition is incurable or that his treatment will only relieve pain but will not improve his physical condition, he has reached maximum cure. If he is not in pain, but more doctors won't be able to improve his physical condition, he has reached maximum cure and he is not entitled to maintenance and cure anymore. The obligation to provide maintenance and cure usually ends when a qualified medical opinion is to the effect that maximum possible cure has been accomplished.

If you decide that the plaintiff is entitled to further maintenance and cure, you must determine when the evidence to pay maintenance began and when it will end. One factor you may consider when determining when that period will end is the date when the seaman resumed his employment, if he did so. However, if the evidence supports a finding that economic necessity forced the seaman to return to work prior to reaching maximum cure, you may take that finding into

consideration when determining the period for maintenance and cure ends.

If you find Mr. Sanford is entitled to an award of damages under either the Jones Act or unseaworthiness claims, and if you award him either lost wages or medical expenses, then you may not award him maintenance and cure for the same period of time. If you give him lost wages, if you give him medical expenses, you may not award him maintenance and cure for that period of time.

However, Mr. Sanford may also be entitled to an award of damages. Even though he wouldn't be entitled to receive medical expenses and lost wages twice for the same thing, he might be entitled to an award of damages for failure to pay maintenance and cure when it was due. If you find that maintenance and cure was still due, you may still award damages for failure to pay maintenance and cure even though you may not be able to award medical expenses and lost wages, because you may have awarded medical expenses and lost wages under one of the other claims. Are we clear on that? Okay.

Now, we have seen the video. We have heard the business about whether Mr. Sanford was an employee who people could get along with. A ship owner who has received a claim for maintenance and cure is entitled to investigate that claim. If, after investigating the claim, the owner unreasonably rejects the claim for maintenance and cure, then the owner is

liable for both the maintenance and cure payments that should have been made and any compensatory damages caused by the failure to pay maintenance and cure. Those compensatory damages for failure to pay maintenance and cure may include any aggravation of Mr. Sanford's condition because of the failure to provide maintenance and cure.

Thus, if you award compensatory damages because of failure to provide maintenance and cure -- I'm sorry. You may award compensatory damages because of failure to provide maintenance and cure if you find by a preponderance of the evidence the following: That Mr. Sanford was entitled to maintenance and cure; that it was not provided; that the defendants acted unreasonably in failing to provide maintenance and cure in stopping those payments; and that the failure to provide maintenance and cure resulted in some injury or aggravation to Mr. Sanford.

If you also find that failure to pay maintenance and cure was not only unreasonable but that it was willful, that is, that it was done with the deliberate intent to do so, you may also award the plaintiff's attorney's fees. However, you should not award attorney's fees unless the defendants acted willfully in disregard of Mr. Sanford's claim for maintenance and cure.

Mr. Sanford may not recover attorney's fees simply for the prosecution of his Jones Act or unseaworthiness

claims. You may only award him attorney's fees incurred in pursuing the maintenance and cure claim and only if you find that failure to pay maintenance and cure was done willfully.

Now, someone who claims damages resulting from the wrongful act of another person has a duty under the law to use reasonable diligence to avoid or minimize or mitigate those damages. You can't just say, "I'm injured. Take care of me." If there's a way for self-help to minimize your damages, you have to do that.

If you find that the defendants are liable and that Mr. Sanford has suffered damages, Mr. Sanford may not recover for any item of damage which he could have avoided through reasonable effort. If you find by a preponderance of the evidence that Mr. Sanford unreasonably failed to take advantage of an opportunity to lessen his damages, you should deny him recovery for those damages which he could have avoided had he taken advantage of the opportunity.

You are the sole judges of whether Mr. Sanford acted reasonably in avoiding or minimizing his damages. An injured person may not sit idly by when presented with an opportunity to reduce his damages. However, he is not required to exercise unreasonable efforts or incur unreasonable expenses in mitigating those damages.

The defendants have the burden of proving the damages which Mr. Sanford could have mitigated. In deciding

whether to reduce Mr. Sanford's damages because of his failure to mitigate, you must weigh all the evidence in the light of the particular circumstances of the case, using your sound discretion, in deciding whether the defendants have satisfied their burden of proving that Mr. Sanford's conduct was been reasonable.

In conclusion, Members of the Jury, your verdict must represent the considered judgment of each of you. In order to reach a verdict, it's necessary that all of you agree. Your verdict must be unanimous. It is your duty, as jurors, to consult with one another and to deliberate with a view to reach an agreement if you can do so without violence to your own independent judgment. You must each determine the case for yourself, but only after an impartial consideration of the evidence in this case with your colleagues.

In the course of your deliberation, do not hesitate to re-examine your own views and change your opinion if you are convinced you are in error, but do not surrender your honest conviction as to the weight of the evidence or the effect of the evidence solely because of the opinion of someone else or for the mere purpose of returning a verdict. Remember something very important at all times: You are not partisans; you are judges of the facts in this case. Your sole interest is to seek the truth as best you can from the evidence in this case. Not from speculation. Not from guesswork.

Now, when you go to the jury room, your first act will be to select one of your colleagues as your foreperson, who will preside over your deliberations and speak for you here in court. We have prepared a special verdict form for your convenience. You will take the form, the evidence, and these jury instructions in the jury room with you.

My staff sometimes get tired of hearing me say this, but they haven't heard me say this for a long time because of Katrina: You have probably taken during Katrina car trips, and some of you have probably used AAA. If you have used AAA, you get what you call a strip map. If you start at the top of the first page and you follow that trip map down to the bottom of the page, you'll get to a certain destination, and then you go to the next page and you go from top to bottom again until you finally reach your destination.

Well, this verdict form is simply a strip map through the very and many elements of the case I have just taken about 45 minutes to describe to you. It is your shorthand questions to be answered through this case. So what you should do is concentrate on question 1, deliberate about it. Don't go to the next. Don't say, "If we answer yes, then what do we have to do?" "If we answer no" -- just focus on the first question, deliberate, reach a verdict, then check "Yes" or "No." Follow the instructions under that question. Those instructions will tell you what question next to go to

deliberate on and so forth until you get to the end of the verdict form. At that point your foreperson will date and sign the form, and we'll be ready to receive your verdict.

The first group of questions deal with the Jones Act, the second group of questions deal with unseaworthiness, the third group of questions deal with maintenance and cure and contributory negligence and contributory damages. They are, frankly, harder to draft than they are for the jury to follow.

So this is your roadmap through the case. Don't look ahead and say, "What does question 7 say?" "If we answer question 1, we are supposed to go to 4. What does question 4 say?" Don't do that. Just deliberate on the question you are encountering, then follow the instructions and go do what you are asked to do next.

You all have really been terrific. It's been a great pleasure for me. I hope you have gotten some pleasure out of this experience yourself. Even if not, I hope you have gotten some enlightenment about our federal justice system.

In just a few minutes, the marshal will bring in all the evidence, the jury instructions, and the verdict form, and you will be asked to begin your deliberations. We'll be waiting for it.

What about lunch? Are they being provided lunch? I don't know what happens anymore. We used to have a

cafeteria or we would order from a restaurant. What do we do now?

We'll order lunch in for you. Pretty soon you can begin talking about the case. Thanks an awful lot. You are excused.

**THE DEPUTY CLERK:** All rise, please.

(WHEREUPON the jury exited the courtroom to being their deliberations.)

**THE COURT:** Counsel, obviously, you will want to go to lunch and the jury will be having lunch, but stay here unless you need to go back to your offices or unless you want to go to lunch. If you leave, please let Steve know where you can be reached. Try to be no longer than 15 minutes away from the courthouse so, if we get a question or a verdict, we can get you back here without too much delay.

Good luck. Thanks for all your cooperation and help. Court is in recess.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON the following exhibit conference was held between the deputy clerk and counsel.)

**THE DEPUTY CLERK:** Defense Exhibits 1 through 20, excluding Exhibit 4 and Exhibit 18, will go to the jury. Exhibit 20 is admitted, but will not go to the jury.

Plaintiff's Exhibits 1 through 29 are admitted and will go to the jury. Counsel will give me their redacted

depositions tomorrow, June 16, to be sent to the Fifth Circuit if necessary.

(WHEREUPON the Court was in recess awaiting word from the jury.)

* * *

(WHEREUPON, the following proceedings were held in chambers.)

**THE COURT:** "For question 7, are we coming up with a lump sum or a yearly sum?"

Well, question 7 is pretty clear, I think. They have to come up with a daily rate of maintenance and a lump sum or yearly sum for cure; no "are we coming up with a lump sum or yearly sum?" I guess cure would be a lump sum, if there's any evidence of future cure, and a daily rate for maintenance.

**MR. O'BRYAN:** Yes. There's evidence of outstanding unpaid medical and the daily rate of maintenance.

**THE COURT:** What do you have to say? Do you have anything contrary?

**MR. MATTESKY:** I agree with Your Honor.

**THE COURT:** So for number 7 we could say: As to maintenance, they have to decide a daily rate; and, as to cure, they have to decide a lump sum. Right?

**MR. MATTESKY:** Yes, Your Honor.

**THE COURT:** "Question 7: As to the maintenance element, you must decide what daily rate, if any, is appropriate under the evidence."

Is that okay?

**MR. MATTESKY:** That sounds fine, Your Honor.

**MR. O'BRYAN:** Yes.

**THE COURT:** "As to cure, you must decide an

appropriate lump sum."

**MR. O'BRYAN:** Yes.

**MR. MATTESKY:** I agree, Your Honor.

**THE COURT:** "If any."

**MR. MATTESKY:** "If any."

**THE COURT:** "An appropriate lump sum, if any."

Now, question 2:

"Also, we would like the stipulations read in court so we can see his daily expenses."

Was there a written stipulation?

**MR. O'BRYAN:** It wasn't written. It was how much he pays a month for food and utilities and --

**MR. MATTESKY:** It was read into the record. It was his monthly house note, his annual insurance, because Your Honor even commented --

**THE COURT:** About Geico.

**MR. MATTESKY:** One of the figures was $500 a month, estimate on food. I think it also included --

**THE COURT:** How do you propose we answer this? Do you want to try to regurgitate those numbers again, if you all can agree to what the evidence was, or do you want to just tell them to recall the evidence as best they can?

**MR. MATTESKY:** The numbers came from Mr. Sanford's deposition, when I went through in his deposition with his expenses, but some of those expenses are not part of

maintenance, not under the law, are not entitled to maintenance.

**MR. O'BRYAN:** Basically, telephone has been --

**MR. MATTESKY:** His rent. His annual insurance. I think there was a tax, utilities, telephone, and the item of food is $500 a month. I don't recall Mr. O'Bryan read it into the record.

**MR. O'BRYAN:** I've got it in my --

**THE COURT:** Well, do you want to get it? See if you can go find it. Unless you have some objection, we'll just give it to them again.

**MR. MATTESKY:** That's fine, Your Honor.

**THE COURT:** Go see if you can get it. "Counsel agree to the following daily expenses," can we say it like that? "Counsel agree that the following daily expenses were entered into evidence." Do you have any objection?

**MR. MATTESKY:** The problem is, Your Honor, that the rent was on a monthly basis.

**THE COURT:** Well, all we can do is tell them what you agree the evidence showed. "Counsel agree the evidence establishes the following," is that okay?

**MR. MATTESKY:** That sounds fine.

**MR. O'BRYAN:** $260, monthly house note.

**THE COURT:** "House note: $260/month."

**MR. O'BRYAN:** $137 a year property tax.

**THE COURT:** "Property tax: $137/annually."

**MR. O'BRYAN:** Homeowner's insurance: $340/annually.

**THE COURT:** "Home insurance: $340/annually."

**MR. O'BRYAN:** Electric utilities: $200/monthly.

**THE COURT:** "Utilities: $200/month."

**MR. O'BRYAN:** Food, $500/month.

**THE COURT:** "Food: $500/month."

**MR. O'BRYAN:** Phone: $50/month.

**THE COURT:** "Telephone: $50/month."

That's it?

**MR. O'BRYAN:** Yes.

**THE COURT:** Wasn't there an insurance thing?

**MR. MATTESKY:** That was homeowner's.

**THE COURT:** That's when I said the Geico thing. Let me sign this. We will await and see what happens.

(WHEREUPON, the following proceedings were held in open court.)

**THE COURT:** Ms. Knowles, has the jury reached a verdict?

**THE FOREPERSON:** Yes, it has, Your Honor.

**THE COURT:** Hand it to Mr. Hill, please.

**THE FOREPERSON:** (COMPLIES)

**THE COURT:** Counsel, approach the bench.

(WHEREUPON, the following proceedings were held at the bench.)

**THE COURT:** On question 7, why don't you look at how they answered it: "Maintenance, $21 day; 100 percent of surgery and related medical expenses."

I think they're talking about the bills that were unpaid because that's the only evidence.

**MR. MATTESKY:** That's true, Your Honor.

**THE COURT:** There was no evidence of future medical expenses.

**MR. MATTESKY:** That's true.

**THE COURT:** No amount. Dr. Bomboy said he needs surgery. Are you satisfied with this verdict? You're not going to be satisfied, but can you accept this answer as not being inconsistent with the evidence?

**MR. O'BRYAN:** Yes. Right. I can live with that.

**THE COURT:** If not, I'm going to have to send them back and tell them they have to clarify. I think that's what they meant.

**MR. MATTESKY:** The only evidence was the unpaid medicals in the amount of $1,600.

**THE COURT:** Are you okay with that? I'm not asking you to waive any rights. I'm just asking if you can accept this verdict without me sending the jury back?

**MR. O'BRYAN:** Yes.

**THE COURT:** In order to close this out, I'm going to have to ask you all to submit a jointly agreed to judgment with

a number. You're going to have to agree to a number on that figure.

**MR. MATTESKY:** I think, Your Honor, we did stipulate the unpaid medicals.

**MR. O'BRYAN:** Yes, for the unpaid medical, but basically it would be implicit that he hasn't reached MMPI yet. That's what I was thinking, because we talked about that before.

**THE COURT:** "100 percent of surgery and related medical expenses." The problem is, under the evidence, I don't think there's any evidence of future medicals.

**MR. O'BRYAN:** Well, he needs surgery.

**THE COURT:** But there was no number put on that.

**MR. O'BRYAN:** We didn't ask for a number, but whatever it turns out to be is what it would be.

**THE COURT:** Well, but that's not reducible to a judgment. You have to have some figure.

**MR. O'BRYAN:** Basically, we can figure out what the maintenance judgment amount would be, just multiply by the number of days from when he was cut off.

**THE COURT:** I'm worried about the medical expenses.

**MR. MATTESKY:** They had the opportunity to present that.

**THE COURT:** Frankly, if they had put a number in there, I would have been, I think, bound to grant a judgment as

a matter of law against it because there was no evidence of numbers.

**MR. O'BRYAN:** For instance, I've had cases where surgery is warranted and we do a motion to compel maintenance and cure and the court says, "Yes, you have to pay for surgery in a reasonable amount." If after the judgment we submit the bills for surgery and there's no refusal to pay -- it's a continuing obligation.

**MR. MATTESKY:** Your Honor, they had the opportunity to present the evidence in their case in chief and did not.

**MR. O'BRYAN:** As a general rule, you can't -- generally, you're not supposed to award future maintenance.

**THE COURT:** You can award future medical expenses. That's an element of compensatory damages.

**MR. O'BRYAN:** Right, but this is --

**THE COURT:** There's no evidence of the cost. Usually what happens is the doctor says, "Well, he is going to need a fusion and it's going to cost $15,000. He will be in the hospital for another five days; that's another $5,000," and there's a number you can attach to it, but here there's no evidence of the number.

**MR. O'BRYAN:** The way I construe it, he hasn't reached MMPI. He needs surgery. The defendant is supposed to pay for it.

**THE COURT:** That's not going to be --

**MR. O'BRYAN:** The judgment amount would be the $21 a day plus the unpaid medical to date.

**MR. MATTESKY:** They had the opportunity to present that.

**THE COURT:** Let who ask you this: This wouldn't go in the judgment, but would your people be willing to pay for his back operation?

**MR. MATTESKY:** I would have to talk to the clients about that.

**THE COURT:** Well, I would recommend it only if they decide not to appeal this.

**MR. MATTESKY:** I understand, Your Honor, and that's something worthy of discussion. That's something we were willing to discuss before this trial.

**THE COURT:** Because you're not going to get much else. Now, I can send them back and tell them to put a number on it, but that's the only other thing I can do.

**MR. O'BRYAN:** We know what the outstanding medical number is.

**THE COURT:** I think you all ought to submit a judgment for the maintenance and for the amount of unpaid medical expenses to date because he is entitled to that under this, and then I would strongly recommend to Florida Transport that they pay for his surgery if he elects to get surgery within, say, six months. You can't agree to pay forever, but I

would say for six months keep it open and agree to pay for his surgery if he gets surgery.

**MR. MATTESKY:** I'll discuss it with my clients, Your Honor.

**THE COURT:** Otherwise, you just to have appeal it to preserve your rights.

**MR. O'BRYAN:** I think he is not at MMPI. That's implicit.

**THE COURT:** But there is no evidence of what the cost of that is. That's the problem. Either that or I'll send them back and tell them to put a number on it.

**MR. O'BRYAN:** I don't need that.

**THE COURT:** Then you guys are going to have to give me a judgment which covers the maintenance and the past medical expenses. That's all we can do. If you want to fight about future medical expenses, you are going to have to go across the street. You can preserve your rights by appealing everything and that will keep that open, as well.

**MR. O'BRYAN:** If the main obligation provides for -- I would construe this as the jury saying he hasn't reached MMPI, then they have to get it up to date, and that this is just a strong showing that they should pay for the surgery bills.

**THE COURT:** I don't think there's any way you can reach that conclusion. That's why I say I could either send

them back and tell them to put a number on it, because my problem would be -- for example, if they had put a number on future medical expenses, I would probably have to remit the judgment because there was no evidence of the quantum as to future medical expenses.

I can do one of two things. I can send them back and tell them I need a number or we can accept this verdict form and you guys can submit a judgment to me for past medical expenses and maintenance. If you can't work out the cost of an operation, then go to the Fifth Circuit, appeal everything, and at least you will reserve your rights. Which do you want? Do you want me to accept this?

**MR. MATTESKY:** I think you should accept that based on the evidence presented at trial.

**MR. O'BRYAN:** I'll accept that.

(WHEREUPON, the following proceedings were held in open court.)

**THE COURT:** Publish the verdict.

**THE DEPUTY CLERK:** United States District Court, Eastern District of Louisiana, Florida Marine Transporters, Inc. versus Michael L. Sanford, Civil Action 04-1354, Section F. Verdict Form:

"1. Do you find from a preponderance of the evidence that defendants were negligent under the Jones Act and that such negligence was a legal cause of the injury to

plaintiff Michael Sanford? No.

"4. Do you find from a preponderance of the evidence the vessel, the M/V FLORIDA EXPRESS, was unseaworthy and that such unseaworthiness was the proximate cause of Michael Sanford's injuries? No.

"5. Do you find from a preponderance of the evidence that the plaintiff, Michael Sanford, is entitled to maintenance and cure? Yes.

"Maintenance: $21 a day;

"Cure: 100 percent of surgery and related medical expenses."

"8. Do you find from a preponderance of the evidence that defendants' withholding of or ceasing to pay maintenance and cure was unreasonable and resulted in some injury to the plaintiff? No.

"Signed by Shannon Knowles this 15th day of June, 2006."

**THE COURT:** Poll the jury.

(WHEREUPON the jury was polled and all answered in the affirmative.)

**THE COURT:** You have been wonderful. Now, let me simply tell you that you do not need to discuss your verdict with anyone. If anyone tries to speak with you about your verdict or your deliberations or how you came to the conclusions you came to, you are under no obligation to speak

with anyone. No one can make you or force you or do anything to intrude on your deliberations. I just want you all to know that.

I hope your houses are in good shape and you're not all living in FEMA trailers and that we have a safe storm season and I get to see you all again sometime. Thank you very much. You are excused.

(WHEREUPON the jury was excused.)

**THE COURT:** The verdict of the jury is the judgment of the Court. The clerk will enter judgment accordingly. I want the parties to submit a judgment to the Court jointly within five days. I'm going to order that each side bear their own expenses. I'm not going to tax costs.

After the colloquy we had here at the bench, I do believe that it was the jury's intention that Mr. Sanford's surgery would be paid for by the defendant because it says "100 percent of surgery and related expenses medical expenses"; not just "medical expenses," but "surgery and related medical expenses." Although there's not a number on that amount, if it was just treated ordinarily as cure, there wouldn't necessarily be a number on that amount, he would just be entitled to cure until maximum medical improvement. If he elects to get surgery, I want his surgery paid for by the defendants. I will assume that that's a part of this judgment, so when you submit a judgment I want it mentioned. Do you understand?

**MR. MATTESKY:** Yes, Your Honor.

**THE COURT:** Anything else I can do for you now?

**MR. O'BRYAN:** Just for our comment the maintenance obligation would be ongoing hereafter.

**THE COURT:** Until maximum cure. Anything else? Thank you all very much. Court is adjourned.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the Court was in recess.)

* * *

**CERTIFICATE**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

__________________________
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter